**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SUBSERO CAPITAL, LLC,<br><br>Plaintiff<br><br>v.<br><br>NATURE'S TREATMENT OF THE QUAD CITIES, LLC, NTQC SERIES I, NTQC SERIES III, MATTHEW STERN, MICHAEL STERN, THEODORE BRUNSVOLD, DARREN BAX, LISA BAX, JIGNESH GANDHI, MICHAEL CRAIG MORTON, SNEHAL BHAVSAR, MAYUR SHAH, TRENT JACQUIN, WILLIAM CHOSLOVSKY, MATTHEW O'CONNOR, CHRISTOPHER WILKES, GINSBERG JACOBS, LLC, JAMES ZMUDA, and CALIFF & HARPER, P.C.,<br><br>Defendants. | Case No. 25-cv-15814 |

**COMPLAINT**

Plaintiff Subsero Capital, LLC ("Subsero Capital"), by its attorneys, states as follows against Defendants Nature's Treatment Of The Quad Cities, LLC ("NTQC"), NTQC Series I ("Milan Series"), NTQC Series III ("Galesburg Series," and together with the Milan Series and NTQC as the "Companies"), Matthew Stern, Michael Stern, Theodore Brunsvold, Darren Bax, Lisa Bax, Jignesh Gandhi, Michael Craig Morton, Snehal Bhavsar, Mayur Shah, and Trent Jacquin (each individual a "Seller," and together with the Companies as "NTI"), William Choslovsky ("Choslovsky"), Matthew O'Connor ("O'Connor"), Christopher Wilkes ("Wilkes"), Ginsberg Jacobs, LLC ("Ginsberg Jacobs"), James Zmuda ("Zmuda"), and Califf & Harper, P.C. ("Califf & Harper"), (Choslovsky, O'Connor, Wiles, Ginsberg Jacobs, Zmuda, and Califf & Harper, are referred to collectively with NTI as the "Defendants"):

## NATURE OF THE ACTION

1. This litigation arises from an agreement between NTI and Subsero Milan Ops, LLC and Subsero Galesburg Ops, LLC (Subsero Milan Ops, LLC and Subsero Galesburg Ops, LLC are referred to hereafter as "Buyers") for the acquisition of NTI's ownership interests in licensed cannabis dispensaries operating in Milan, Illinois and Galesburg, Illinois, including the associated real estate interests in connection with those dispensaries (the "Transaction"). The Transaction collapsed because NTI failed to execute two documents that were required for approval by the Illinois Department of Financial and Professional Regulation ("IDFPR").

2. Recognizing that pursuit of claims against the prospective Buyers would likely be futile since the Buyers were limited purpose entities formed solely for the purpose of the acquisition, NTI and their counsel fabricated a claim against Subsero Capital, an entity that was to have served as a Guarantor had the Transaction secured IDFPR approval and proceeded to closing. But Subsero Capital was not actually a party to the Transaction and had not executed a Guaranty in connection with the putative Transaction. Thus, in an improper attempt to evade the consequences of the inaction by the Sellers and the negligence of Sellers' counsel that tanked the Transaction, NTI and their counsel, William Choslovsky, Matthew O'Connor, and Ginsberg Jacobs, manufactured a "Guaranty" and filed litigation against Subsero Capital predicated on the Guaranty that they forged.

3. Specifically, NTI sued Subsero Capital based on a Guaranty that Choslovsky and O'Connor conspired to manufacture for use in the litigation. Choslovsky and O'Connor "signed" the Guaranty by taking a signature page from a different document that Subsero Capital had signed and appending it to a draft of the Guaranty that Choslovsky and O'Connor modified or used in the litigation in an improper effort to resuscitate claims against Subsero Capital related to the

Transaction. NTI, in conspiracy with its attorneys, Choslovsky, O'Connor, Wilkes, Ginsberg Jacobs have proceeded to pursue litigation based on the forged Guaranty in litigation pending in the Circuit Court of Cook County, Illinois (the Cook County Lawsuit) since November 2022.

4. Although Subsero Capital knew it had never signed the Guaranty and contested the Guaranty claim from the inception of the Cook County Lawsuit, it found itself in the position of having to prove a negative: that it did not sign the document with a Docusign signature of its member. However, that circumstance changed in August 2025 when Subsero Capital deposed O'Connor. In that deposition, O'Connor admitted to the fraud and that he created the Guaranty in concert with Choslovsky at his request and direction. O'Connor's gave testimony describing how the forgery was created and which exposed misleading or false statements given by him in an affidavit created for his signature by Choslovsky for the litigation.

5. Yet, even then, NTI and its counsel, Choslovsky, Wilkes, Ginsberg Jacobs, James Zmuda, and Califf & Harper, declined to withdraw the claim against Subsero Capital that is predicated on the Guaranty forged by Choslovsky and O'Connor for use in the litigation. Instead, NTI filed an additional amended complaint in October 2025 continuing to pursue a claim against Subsero Capital predicated on the forged Guaranty.

6. Through this litigation, Subsero Capital seeks to recover the damages it has incurred as a consequence of the abuse of the courts and fraud by Defendants who have pursued litigation against Subsero Capital based on a contract manufactured by them with a signature forged by Choslovsky and O'Connor.

## THE PARTIES

7. Plaintiff Subsero Capital is a citizen of the State of Michigan. It is a Michigan limited liability company, whose sole member is BRIGCAN, LLC, another Michigan limited

liability company whose sole member is Bret Russell, Trustee of the Bret A. Russell Revocable Living Trust, a citizen of the State of Michigan.

8. Defendant NTQC is a limited liability company whose members are either citizens of the State of Illinois or the State of Florida. Consequently, NTQC is a citizen of Illinois and Florida.

9. Defendant Milan Series is a limited liability company whose members are either citizens of the State of Illinois or the State of Florida. Consequently, Milan Series is a citizen of Illinois and Florida.

10. Defendant Galesburg Series is a limited liability company whose members are either citizens of the State of Illinois or the State of Florida. Consequently, Galesburg is a citizen of Illinois and Florida.

11. Defendant Matthew Stern is a citizen of Illinois resident who resides in Rock Island County, Illinois, is a member of the Companies, and is the manager of the Companies.

12. Defendant Michael Stern is a citizen of Florida and is a member of the Companies.

13. Defendant Theodore Brunsvold is a citizen of Illinois and is a member of the Companies.

14. Defendant Darren Bax is a citizen Illinois and is a member of the Companies.

15. Defendant Lisa Bax is a citizen of Illinois and is a member of the Companies.

16. Defendant Jignesh Gandhi is a citizen of Illinois and is a member of the Companies.

17. Defendant Michael Craig Morton is a citizen of Illinois and is a member of the Companies.

18. Defendant Snehal Bhavsar is a citizen of Illinois and is a member of the Companies.

19. Defendant Mayur Shah is a citizen of Illinois and is a member of the Companies.

20. Defendant Trent Jacquin is a citizen of Illinois and is a member of the Companies.

21. Defendant William Choslovsky is a citizen of Illinois or of Florida, as, on information and belief he maintains residences in both Florida and Illinois. Choslovsky is currently licensed to practice law in the State of Illinois and employed by the law firm Taft at its Chicago, Illinois office. On information and belief, at all times material to this lawsuit, Choslovsky had an ownership interest in or was otherwise employed by Ginsberg Jacobs, and the conduct that is at issue in this lawsuit occurred during the time that Choslovsky was affiliated with Ginsberg Jacobs.

22. Defendant Christopher Wilkes is a citizen of Illinois resident and is currently licensed to practice law in the State of Illinois. On information and belief, at all times material to this lawsuit, Wilkes was employed by Ginsberg Jacobs.

23. Defendant Matthew O'Connor is a citizen of Illinois resident and is currently licensed to practice law in the State of Illinois. On information and belief, at all times material to this lawsuit, O'Connor was employed by Ginsberg Jacobs.

24. Defendant Ginsberg Jacobs is a limited liability company. Ginsberg Jacobs is a law firm with its office in Chicago, Illinois. On information and belief, none of the members of Ginsberg Jacobs are citizens of the State of Michigan, and on information and belief, Ginsberg Jacobs is a citizen of the State of Illinois.

25. Defendant James Zmuda is a citizen of Illinois licensed to practice law in the State of Illinois. On information and belief, Zmuda has an ownership interest in Califf & Harper, a law firm with its office in Moline, Illinois.

26. Defendant Califf & Harper is a professional corporation with its principal place of business in Moline, Illinois.

## JURISDICTION AND VENUE

27. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is a complete diversity of citizenship between the parties, as Plaintiff Subsero Capital is a citizen of the State of Michigan; all of the Defendants are citizens of the State of Illinois or the State of Florida; and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

28. This dispute arises from fraudulent conduct committed in Cook County, Illinois through the initiation of a lawsuit by Sellers, predicated in part on a forged Guaranty manufactured by Sellers counsel for use in Sellers' lawsuit against Subsero Capital and others that was filed in Cook County, Illinois. Consequently, venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b) as a substantial part of the events and omissions giving rise to the claims that are the subject of this litigation occurred within this judicial district.

## FACTS COMMON TO ALL COUNTS

29. On January 21, 2022, NTI and Buyers entered into a Membership Interest Purchase Agreement (the "MIPA"), a contract documenting the terms of the Transaction. A true and correct copy of the MIPA executed by NTI and Buyers is attached as **Exhibit 1**.

30. Approval of the Transaction by the Illinois Department of Financial and Professional Regulation ("IDFPR") was required by Illinois law and was a closing condition precedent pursuant to the terms of the MIPA.

31. After the MIPA was submitted to IDFPR and before a response was received from it, Sellers and Buyers engaged in additional negotiations relating to the Transaction and reached an agreement on terms modifying the Transaction. The modification negotiated between Sellers and Buyers would have permitted Sellers to rollover some of the proceeds due to them upon the closing of the Transaction via an Exchange Agreement to acquire ownership interests in the entity

that would hold the licenses following the closing of the Transaction in percentages to be communicated by the participating Sellers based on the financial contribution by them of interests.

32. However, the IDFPR rejected the MIPA and identified amendments to the MIPA that it required in order for it to approve the Transaction.

33. Buyers' counsel communicated to IDFPR that Buyers and Sellers had negotiated an agreement that modified the Transaction and that Sellers would rollover a portion of their proceeds from the Transaction via an "Exchange Agreement" to acquire interests in the entity that would ultimately hold the licenses to be sold by Sellers through the Transaction. In light of this additional information, IDFPR advised that approval of the Transaction would also require review of the Exchange Agreement in addition to the amended MIPA.

34. The Exchange Agreement, and amendments to the MIPA addressing the modifications required by IDFPR as well as other modifications negotiated by Buyers and Sellers (the "Amendment"), was drafted and approved by counsel for NTI and Buyers. The Amendment and the Exchange Agreement were submitted to IDFPR for its preliminary review.

35. IDFPR provided preliminary approval and indicated it would review the Transaction when all signed documents were submitted.

36. However, Sellers controlled the operations of the dispensaries in Milan and Galesburg and were receiving substantial distributions on a monthly basis for each month that the Transaction did not close. Consequently, to continue to collect distributions from the operations of the two dispensaries, Sellers deliberately chose not to sign the Amendment and not to sign the Exchange Agreement to avoid closing on the Transaction.

37. Absent receipt of executed copies of the Amendment and the Exchange Agreement, as well as submission of other completed documents required by IDFPR as conditions of receiving

approval of the Transaction, IDFPR declined to proceed with a review of the Transaction making the closing of the Transaction impossible.

38. June 30, 2022, the date designated for closing the Transaction under the MIPA, passed, and Sellers had not provided executed copies of the Amendment or Exchange Agreement causing the Transaction to terminate by its own terms.

39. Instead of accepting responsibility for their failures, NTI and their counsel have engaged in fraudulent conduct. Defendants filed and/or pursued claims based on a document Choslovsky and O'Connor, individually and as agents of Ginsberg Jacobs, specifically manufactured and forged (the "Forged Guaranty") for purposes of litigation commenced against Subsero Capital that is pending in the Circuit Court of Cook County, Illinois. A true and correct copy of the Forged Guaranty filed by NTI and their counsel in the Circuit Court of Cook County, Illinois is attached as **Exhibit 2**.

40. Since filing the Cook County Lawsuit in November 2022 asserting a claim against Subsero Capital predicated on the forged Guaranty, Defendants have engaged in an ongoing and improper scheme to use the Cook County Lawsuit to defraud Subsero Capital, its member, and entities that were not parties to the failed Transaction, to attempt to gain funds to which NTI and its counsel are not entitled, and as a device through which to engage in unlawful anticompetitive conduct.

41. The improper actions of NTI and their lawyers have caused Subsero Capital to incur hundreds of thousands of dollars in damages in order to resist Defendants' fraud and their extortionary, wrongful, and deliberate misuse of legal process.

**A. <u>The MIPA</u>**

42. In Illinois, cannabis licenses are issued and regulated by IDFPR, and IDFPR approval is a condition precedent to selling a license or changing ownership of a licensed entity.

43. IDFPR requires receipt of certain documents and information before it will approve a transaction involving a cannabis license.

44. IDFPR has notified the public that "Once the Department receives all of the required information, the Department will notify the license holder that the change of ownership request is under review."

45. NTQC and Sellers formed a number of series limited liability companies to operate medical marijuana dispensaries and to hold real estate interests, including NTQC Series I which owns and operates a licensed cannabis dispensary at 973 Tech Dr., Milan Illinois (the "Milan Dispensary"), and NTQC Series III, which owns and operates a licensed cannabis dispensary at 735 W. Main St, Galesburg Illinois (the "Galesburg Dispensary").

46. Sellers own all of the membership interests, issued as well as outstanding, in NTQC Series I (the "Milan Interests") and NTQC Series III (the "Galesburg Interests" and together with the Milan Interests as the "Membership Interests").

47. The Milan Dispensary holds (i) an Early Approved Adult Use Cannabis Dispensing Organization License, No. 284.000028-AUDO, issued by IDFPR, and (ii) a Registered Medical Cannabis Dispensing Organization License, No. 280.000025 issued by IDFPR.

48. The Galesburg Dispensary holds an Early Approval Adult Use Cannabis Dispensing Organization License, No. 284.000054-AUDO issued by IDFPR.

49. On January 21, 2022, Buyers and NTI signed the MIPA pursuant to which Sellers proposed to sell the Membership Interests to Buyers. Ex. 1.

50. Pursuant to Illinois law and the terms of the MIPA, IDFPR approval of the Transaction, including the proposed change of ownership of the licenses held by NTI, was a condition precedent to complete the Transaction (the "Closing").

**B. <u>NTI's failure to comply with IDFPR requirements</u>**

51. In February 2022, the MIPA was submitted to IDFPR for review.

52. Pursuant to the terms of the MIPA, Sellers continued to control the Milan Dispensary and the Galesburg Dispensary through closing and would receive distributions based on the operations of those two dispensaries until closing of the Transaction. The distributions to each of the Sellers were more than one million dollars per year, so Sellers were in no rush to close the Transaction.

53. In April 2022, IDFPR notified the parties that it would not approve the Transaction without certain changes. IDFPR notified the parties of the changes to the MIPA that would be required in order to obtain its approval of the Transaction.

54. During a telephone conversation with representatives from IDFPR about the MIPA concerning defects in the MIPA, IDFPR was notified that some of the Sellers planned on rolling some of the sale proceeds that would be due to them from the Transaction into the post-closing entity that would own the membership interest in the Companies following the Closing. Thus, certain of the Sellers would indirectly remain owners of the Companies following the Closing.

55. In response to being informed that some of the Sellers planned on rolling some of their sale proceeds from the Transaction into the post-closing entity that would own the membership interest in the Companies following the Closing, IDFPR communicated that in addition to the changes to the MIPA it identified would be required to close on the Transaction, IDFPR would need to understand the entire Transaction before it could issue its approval.

56. Buyers and NTI negotiated and agreed upon a draft Amendment to the MIPA to remedy the issues identified by IDFPR as issues that would preclude approval of the MIPA.

57. Buyers and NTI also negotiated and agreed upon a draft Exchange Agreement which allowed Sellers to roll over a portion of their sale proceeds into an entity affiliated with Buyers, and thus, Sellers would maintain ownership interests in an entity that was to hold the licenses that were the subject of the Transaction after the closing of the Transaction.

58. NTI's lawyer, Zmuda, reviewed and approved the draft Amendment and Exchange Agreements and communicated his approval to Buyers.

59. The draft Exchange Agreement contained a Schedule for Sellers to identify which Sellers were rolling over their proceeds and the specific amount of their rollover (the "Schedule").

60. On April 26, 2022, the draft Amendment and Exchange Agreements were submitted to IDFPR for preliminary review.

61. On April 27, 2022, IDFPR responded "We have reviewed the documents submitted. They look like they will be sufficient based on our preliminary review. We will accept and fully review the executed documents when you provide them. Thank you for making the requested adjustments."

62. NTI was advised that the execution of the Amendment and Exchange Agreement was a requirement before IDFPR would complete and approve the sale of the Membership Interests.

63. Additionally, IDFPR required Sellers to complete and submit various documents regarding the change of ownership ("IDFPR Documentation") that would be facilitated if the Transaction closed. The IDFPR Documentation consisted of forms requesting personal information for each of the Sellers and fingerprints from each of them. Receipt of the completed Schedule and the fully completed IDFPR Documentation was required by IDFPR as part of its review.

64. On April 27, 2022, Sellers were advised that IDFPR had confirmed the need for the IDFPR Documentation before it would finish conducting its review to evaluate approval of the sale of the Membership Interests (the "April 27 Email").

65. The April 27 Email outlined some of the items needed for Closing including information required to complete the Exchange Agreement for IDFPR's review. The April 27 Email communicated that: "1. Each [NTI] holder to confirm dollar amount for tax-free exchange rollover into Illinois parent entity; 2. All forms signed / notarized – appreciate the time in getting this all done (we have received some already); and 3. Sub notes – confirm dollar amount (separate from rollover) for [NTI] holders or others into our Illinois parent entity. Note, only the rollover is a tax-free exchange for [NTI] holders. We can only allocate total of $5mm here."

66. Despite Zmuda's approval of the Amendment and Exchange Agreement, the preliminary approval of these documents by IDFPR, and IDFPR's communication that it would not further process its

review of the Transaction without receipt of executed copies of the Amendment and Exchange Agreement, NTI never signed the Amendment or Exchange Agreement. However, Sellers continued to receive distributions of the profits from the sales of the Milan Dispensary and the Galesburg Dispensary.

67. Despite repeated requests and urging, Sellers failed to timely complete and return the IDFPR Documentation; failed to provide the completed Schedule or execute the Exchange Agreement; and failed to execute the Amendment preventing the materials required by IDFPR for it to commence review of the Transaction.

68. In May 2022, Buyers learned that Matt Stern, as agent for Sellers, was intentionally not completing and returning the IDFPR Documentation because every month that passed without the Transaction closing was another month that the Companies generated significant revenue that resulted in significant distributions to Sellers.

69. Stephanie Vasquez and Shannon Duncan, employees of the Companies, had been tasked by Matt Stern to gather documents from the Sellers in connection with the Transaction.

70. Matt Stern told Vasquez and Duncan Stern that Sellers were intentionally delaying completing and returning the IDFPR Documentation so that Sellers would continue to receive their monthly distributions. Matt Stern's admission concerning the intentional delay in completing the documents required for the Transaction to proceed to closing was sent to Buyers via text message in May 2022.

71. On May 28, 2022, Buyers, through Mina Guiahi, the individual who negotiated the Transaction on behalf of Buyers, sent a text message directly to Matt Stern in his capacity as NTI's representative stating: "the delay in forms has been a real issue. I ran out of excuses on my side."

72. Matt Stern falsely communicated to Guiahi via text message that he had communicated with IDFPR concerning the proposed sale of NTI's licenses. On May 28, 2022, and June 22, 2022, Matt Stern attempted to blame IDFPR for being so busy that Seller returning the required IDFPR Documentation could not be the cause for slowing down approval of the transaction. He misrepresented to Guiahi that he had communicated with IDFPR concerning the transaction and the IDFPR Documentation.

73. On June 22, 2022, NTI, through its representative, Matt Stern, notified Buyers that termination of the Transaction was acceptable to NTI and that Sellers would keep the $1 million earnest money placed in escrow by Buyers in connection with the Transaction.

74. NTI never provided the "rollover amounts" or the signed Amendment and Exchange agreements to Buyers prior to June 30, 2022, the date on which the Transaction would terminate pursuant to the terms of the MIPA, or at any other time thereafter, preventing the completed documents from being submitted to IDFPR so that it could commence the review process.

75. Sellers never signed the Amendment or the Exchange Agreement.

76. Consequently, IDFPR did not commence review of the Transaction, as amended, because Sellers failed to sign the documents required of them to allow the Transaction to advance to IDFPR review.

77. On October 13, 2022, having not received completed and executed copies of the Amendment or Exchange Agreements, counsel for Buyers issued a letter to NTI's counsel confirming that the MIPA had terminated due to Sellers' willful misconduct.

78. On November 16, 2022, NTI sued Subsero Capital, Buyers, and Mina Guiahi in the Circuit Court of Cook County, Illinois in the Cook County Lawsuit. The claim against Subsero Capital in the Cook County lawsuit was predicated exclusively on the Forged Guaranty alleging that Subsero Capital was in breach of the Guaranty. However, Subsero Capital never signed the Guaranty nor did it authorize anybody to execute the Guaranty on its behalf.

### C. <u>**NTI, through their attorneys, Choslovsky and O'Connor, forged a document to create a purportedly signed Guaranty**</u>

79. Commencing in or about the August 2021, attorneys Choslovsky and O'Connor, along with their law firm Ginsberg Jacobs, represented NTI in the Transaction.

80. A draft of the Guaranty to be given by Subsero Capital as to certain obligations of the Buyers was one of these ancillary documents that was negotiated by the parties in connection with the proposed Transaction. This draft Guaranty was appended, unsigned, and sent to IDFPR, when the MIPA was originally submitted for approval.

81. Subsero Capital never signed the Guaranty. Subsero Capital did not authorize anybody to execute the Guaranty on its behalf.

82. The signature page on the draft form Guaranty states above the signature line: "IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written."

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

"*Guarantor*"

**SUBSERO CAPITAL LLC**

83. The signature page on the draft form Guaranty contains document ID number 01065639-33.

84. From the time that NTI and their lawyers, Choslovsky, Wilkes, and Ginsberg Jacobs filed the Cook County Lawsuit through the date this lawsuit were filed, NTI, Choslovsky, Wilkes, and Ginsberg Jacobs have falsely maintained in filings with the Circuit Court of Cook County, Illinois, briefs submitted to the Circuit Court of Cook County, and an affidavit submitted to the Circuit Court of Cook County, that Subsero Capital signed this Guaranty on January 21, 2022 concurrent with the parties' execution of the MIPA. A true and correct copy of the affidavit attesting to that Subsero Capital signed the Guaranty is attached as **Exhibit 3**.

85. The signature page on the Forged Guaranty Defendants filed in the Cook County Lawsuit and rely upon for their breach of contract claim relating to the Guaranty, (the Forged Guaranty attached as Exhibit 2 to this Complaint), states in part "IN WITNESS WHEREOF, the undersigned has set its hand hereto effective as of the date first written above."

IN WITNESS WHEREOF, the undersigned has set its hand hereto effective as of the date first written above.

STOCKHOLDER

SUBSERSO CAPITAL, LLC

BY: BRIGCAN, LLC, its Manager

By: ______________________
Print Name: Bret Russell
Its: Manager

86. The signature page on the Forged Guaranty Defendants filed in the Cook County Lawsuit as the basis of the Guaranty claim asserted on behalf of NTI is identified by document ID number 01118321-3.

87. A different document, "Subsero Holdings – Illinois, Inc. Action By Written Consent Of The Sole Stockholder (the "Written Consent"), a document which has been appended by Defendants as an exhibit to a subpoena they served on non-party Chicago Atlantic during discovery in the Cook Couty Lawsuit, contains document control number 01118321-3 on its signature page. This is the identical document control number on the signature page to the Forged Guaranty upon which Defendants rely for their Guaranty claim in the Cook County Lawsuit.

88. The signature page that Defendants misrepresented in filings with the Circuit Court of Cook County since the inception of the Cook County Lawsuit to be the executed Guaranty signature page is actually the signature page to a different document: it comes from the Written Consent.

89. From the time that NTI and Choslovsky, Wilkes, and Ginsberg Jacobs caused the initial complaint on behalf of NTI in the Cook County Lawsuit through the date this Complaint was filed, NTI and its lawyers, Choslovsky, Wilkes, and Ginsberg Jacobs, have falsely asserted that Subsero Capital has liability for breaching the signed Guaranty.

90. Further, since NTI's pleadings in the Cook County Lawsuit were "verified" by each of the Sellers, the Sellers had an obligation to undertake measures to confirm to accuracy of their accusations.

91. On August 13, 2025, prior to the filing of NTI's Second Amended Complaint in the Cook County Lawsuit, O'Connor testified under oath at a deposition to his creation of the Forged Guaranty, a document that he admitted creating, for the purpose of this litigation and that had been used as an exhibit to support claims and allegations made by NTI in this litigation. A true and correct copy of O'Connor's deposition transcript is attached as **Exhibit 4**.

92. Thus, no later than the completion of O'Connor's deposition on August 13, 2025, Defendants each had actual notice that the breach of Guaranty claim asserted by NTI in the Cooik County Lawsuit alleging that Subsero Capital had executed the Guaranty was false.

93. O'Connor and through him, Ginsberg Jacobs, removed the document control number from the Microsoft Word version used by Defendants for the Forged Guaranty in an effort to conceal their misconduct in the fabrication of the document they intended to use and did in fact use as the "basis" of the Guaranty claim asserted by NTI against Subsero Capital in the Cook County Lawsuit.

94. In November 2022, Choslovsky, O'Connor, and through them, Ginsberg Jacobs, appended the unrelated signature page to the unsigned Microsoft Word version of the Guaranty in preparation for the commencement of the Cook County Lawsuit against Subsero Capital. Ex. 4, O'Connor Dep. p. 137.

95. In November 2022, Choslovsky, O'Connor, individually and as agents of, Ginsberg Jacobs, created the Forged Guaranty specifically for use as a basis upon which to sue Subsero Capital in the Cook County Lawsuit. Ex. 4., O'Connor Dep. p. 149.

96. On information and belief, Choslovsky, O'Connor, NTI, and Ginsberg Jacobs targeted Subsero Capital as a defendant in the Cook County Lawsuit, despite the fact that it was not a party to the Transaction, because they believed that it had or had access to substantial funds and believed that the Buyers, two entities formed for the sole purpose of the Transaction, did not.

97. NTI knew or should have known through the exercise of reasonable diligence, that the Guaranty was never signed by Subsero Capital. Yet, NTI in conspiracy with its counsel have maintained in each of the pleadings filed by them in the Cook County Lawsuit, and in an affidavit signed by O'Connor (Ex. 3) that Subsero Capital had signed the Guaranty.

98. No later than O'Connor's deposition on testimony August 13, 2025, at which O'Connor testified that he created the Forged Guaranty for the purpose of the Cook County Lawsuit, and that there was no "signed Guaranty" in January 2022, Defendants knew or should have known through the exercise of reasonable diligence, that Subsero Capital had not signed the Guaranty.

99. Based on O'Connor's admissions in his deposition on August 13, 2025 concerning his creation of the "signed" Guaranty, at the time Choslovsky, Wilkes, and Ginsberg Jacobs, signed the Second Amended Verified Complaint in the Cook County Lawsuit, they knew or should have known through the exercise of reasonable diligence, that the Guaranty claim in the Second Amended Verified Complaint that they caused to be filed in the Circuit Court of Cook County was based on a Forged Guaranty.

100. At the time they signed the Second Amended Verified Complaint and communicated to their clients concerning the verification of this pleading, Choslovsky, Wilkes, and Ginsberg Jacobs signed the Second Amended Verified Complaint with actual knowledge that the representation they pled on behalf of their client NTI, specifically, that Subsero Capital executed or signed the Guaranty on which the Guaranty claim in that pleading rested, was a false representation.

101. Based on O'Connor's admissions in his deposition on August 13, 2025 concerning his creation of the "signed" Guaranty, at the time Choslovsky, Wilkes, and Ginsberg Jacobs signed the Third Amended Verified Complaint filed in the Cook County Lawsuit, they knew or should have known through the exercise of reasonable diligence, that the Guaranty claim asserted in the Third Amended Verified Complaint filed in the Cook County Lawsuit was based on a forged document. At the time they signed the Third Amended Verified Complaint and communicated to their clients concerning the verification of this pleading, Choslovsky, Wilkes, and Ginsberg Jacobs signed the Third Amended Verified Complaint with actual knowledge that the representation they pled on behalf of their client NTI, specifically, that Subsero Capital executed or signed the Guaranty on which the Guaranty claim in that pleading rested, was a false representation.

102. Zmuda and Califf & Harper, as counsel for NTI in the Cook County Lawsuit were aware no later than August 13, 2025 that the Guaranty claim that Zmuda and Califf & Harper, as counsel for NTI,

was pursuing against Subsero Capital was baseless resting on a forged document. Yet, they persisted to use the Circuit Court of Cook County, Illinois to pursue a claim known to them rested on a forgery manufactured by Choslovsky and O'Connor for the purposes of the litigation.

103. Since NTI was required to exercise reasonable diligence in connection with the execution of the verifications that were ultimately submitted by or on their behalf with the Third Amended Verified Complaint filed in the Cook County Lawsuit, they knew or should have known through reasonable diligence required in connection with their verification of that pleading that their allegation in Guaranty claim rested on knowingly false representations including the representation that Subsero Capital signed the Guaranty on which the Guaranty claim in that pleading rested.

104. Further, Defendants knew or should have known through reasonable diligence, on July 18, 2025, when Subsero Capital's counsel sent correspondence to Choslovsky, Wilkes, and Zmuda, demanding that their clients withdraw their claims resting on the Forged Guaranty, that the representation that Guaranty had been signed or executed by Subsero Capital, an allegation on which NTI's breach of Guaranty claim rests is false.

105. Despite this knowledge of the falsity of the claim on which the Guaranty claims of the Complaint, the Amended Complaint, Second Amended Complaint, and Third Amended Complaints is predicated, Defendants deliberately proceeded to litigate the Guaranty claim asserted against Subsero Capital that is asserted in those pleadings. They have persisted in making filings using the "wires" through emails.

106. Further, on information and belief, Defendants have used phone calls, text messages, and emails to communicate and coordinate and to commit their fraudulent scheme through which they have knowingly pursued baseless claims against Subsero Capital.

107. Defendants knew or should have known through the exercise of reasonable diligence, having verified or signed the pleading, that Capital had not signed the Guaranty based on O'Connor's admissions in his deposition on August 13, 2025.

108. The document that Defendants have misrepresented to the Circuit Court of Cook County through multiple filings and statements made in the Cook County Lawsuit since the inception of the Cook County Lawsuit to be a Guaranty executed by Subsero Capital is, and always has been, a forgery manufactured by Choslovsky and O'Connor for the purposes of pursuing a baseless claim against Subsero Capital, an entity they knew had not signed the Guaranty.

## D. NTI's extortion efforts and the Rock Island Litigation

109. Zmuda, one of NTI's counsel in the Cook County Lawsuit, filed a separate lawsuit in Rock Island County - Nature's Treatment of the Quad Cities, LLC; NTQC Series I; and Matthew J. Stern vs Bret Russell, Inc.; Subsero Illinois Grow Re, LLC; Subsero Holdings – Illinois, Inc.; Subsero Capital, LLC; Bret Russell; and Mina Guiahi in Rock Island County, Illinois Case No. 24 LA 26 (the "Rock Island Litigation").

110. The Rock Island Litigation, filed after the Cook County Lawsuit had been pending for more than a year, is based on the same set of facts and arises out of the same set of circumstances as the Cook County Lawsuit.

111. The Rock Island Lawsuit was filed in coordination with Choslovsky and NTI to add additional pressure on Subsero Capital, its member, and principal although Subsero Capital was not party to the Transaction, and they were aware that Subsero Capital had not engaged in the conduct of which it was accused in the Rock Island Litigation.

112. Defendants initiated both the Rock Island Litigation and the Cook County Lawsuit intending to cause Subsero Capital and its member including entities in which Subsero Capital's member has an interest, to terminate lawful business operations in the State of Illinois and to surrender those interests to NTI to avoid the expense of litigation despite the fact that the contract at the core of the cases could not be performed based on NTI's failure to execute the Amendment or the Exchange Agreement, ignoring that Subsero Capital was not a party to the Transaction, and that Subsero Capital did not ever sign the Guaranty.

113. Defendants initiated the Rock Island Litigation and asserted the Guaranty claim in the Cook County Lawsuits to eliminate Subsero Capital, its member including entities in which Subsero Capital's member has an interest, as a business competitors to the Companies and to extort from them or the people

or entities that have ownership interests in Subsero Capital any cannabis-related rights or assets in the State of Illinois.

**E. <u>NTI used this litigation to obtain information about its business competitors.</u>**

114. Matt Stern, in conspiracy with Choslovsky, Wilkes, and Zmuda, have used discovery in the Cook County Lawsuit to obtain information about NTI's business competitors for use in competition against them. For example, Defendants have used discovery to explore how people employed by various entities in which Subero Capital's member has an interest, are compensated, who has access to bank accounts, who pays the "light bill," to delve into the identity of "Subsero's" owner's other holdings, its management, its landlords, businesses, and the costs to build its facilities, and which dispensary its owner is likely to purchase next and its rent at specific locations.

115. Defendants have used discovery in the Cook County Lawsuit to inquire about an entity unrelated to Subsero's owner's cannabis businesses that, instead, builds multi-family apartments and to inquire about "anything that Subsero may own," which included probing the dates it plans to break ground for new businesses, who has knowledge of the new businesses, the physical plans for new businesses (*e.g.*, blueprints), businesses besides cannabis dispensaries, the exact dollar amount of compensation received for managing facilities and commission structures, and possible businesses in other states besides Illinois as well as the marketing and marketing strategies considered and implemented by them.

116. Defendants have used discovery in the Cook County Lawsuits to depose Jill Russell, a primary school teacher in Michigan whose only connection to this case is her marriage to Bret Russell, the member of the entity that is the member of Subsero Capital. Jill Russell was known to have no interest in or involvement in Subsero Capital, but Defendants undertook her deposition to get information concerning the Russell's assets in Michigan and businesses in which Mr. Russell has an interest having no connection the claims in the Cook County Lawsuit. This deposition was undertaken to harass the Russells as part of a scheme to extort Mr. Russell's transfer of assets in which he has an interest.

## F. Subsero Capital's Damages

117. Subsero Capital has incurred substantial legal expense well in excess of the jurisdictional minimum because of the fraud and abuse of process undertaken by Defendants including through the fraud perpetrated by them predicated through the use of the Forged Guaranty to pursue claims that they knew were baseless.

118. Subsero Capital has incurred substantial expense as a consequence of being the subject of litigation that was initiated against it by Defendants although Defendants were aware that the claims against Subsero Capital were without factual basis and rested on a forged Guaranty manufactured specifically for use in this lawsuit as a device through which to extort Subsero Capital and its principal, Bret Russell.

## Count I – Fraud Against Choslovsky and O'Connor

119. Subsero Capital repeats and realleges paragraphs 1 to 118 as the allegations of this paragraph.

120. In or about October 13, 2022, Buyers advised Matt Stern and Choslovsky that NTI had not fulfilled their obligations under the MIPA and that the Transaction would not proceed and had terminated.

121. On information and belief, at that point, as Choslovsky evaluated NTI''s options in response to Buyers' October 13, 2022 correspondence, Choslovsky recognized that he, O'Connor, and Ginsberg Jacobs had failed to negotiate terms favorable to NTI should the Transaction not close since Galesburg and Milan were shell entities created specifically for the purposes of the acquisition, a fact known to them prior to the execution of the MIPA.

122. On information and belief, at this same point, Choslovsky recognized that he, O'Connor and Ginsberg Jacobs had failed to negotiate adequate security for their clients since they had not obtained an executed Guaranty from Subsero Capital at the time the MIPA was signed.

123. On information and belief, at this point, Choslovsky also recognized that Ginsberg Jacobs' failures in the Transaction, including its failure to follow-up with its clients to ensure that they undertook all the steps required of them to obtain IDFPR approval so that the Transaction could close, constituted legal malpractice.

124. On information and belief, at this point, Choslovsky understood that Bret Russell, who he understood to be the financing behind Subsero Capital, was not a party to the MIPA or the Transaction. Consequently, he developed a scheme through which Russell, through his interest in Subsero Capital and other entities, could be pressured to pay off NTI in a manner that would conceal the legal malpractice by Ginsberg Jacobs in its representation of NTI in the Transaction.

125. Choslovsky's scheme to pressure Russell to pay off NTI, an effort to conceal Ginsberg Jacobs' malpractice, was predicated on the use of a lawsuit that included claims against Subsero Capital to enforce the Guaranty.

126. Since the Guaranty had not been signed, Choslovsky caused O'Connor to create the Forged Guaranty for use in the litigation.

127 In response to requests from Choslovsky, O'Connor altered the Guaranty to include an unrelated signature page from a separate document.

128. The Forged Guaranty created the false impression that the Guaranty had been executed.

129. Upon information and belief, O'Connor and Choslovsky intended to defraud Subsero Capital and the Circuit Court of Cook County by bringing claims predicated on the Forged Guaranty on behalf of NTI.

130. O'Connor had actual notice that the Guaranty had been forged and conspired with Choslovsky and Wilkes as well as NTI in the use of the Forged Guaranty in the filing of the Second Amended Verified Complaint and the Third Amended Verified Complaint in the Cook County Lawsuit.

131. As a result of the fraud perpetrated by Choslovsky O'Connor through the forgery of the Guaranty and bring suit against Subsero Capital for breach of the Guaranty although they knew that Subsero Capital had not signed it, Subsero Capital suffered actual damages in the form of reasonable attorneys' fees and costs, business expenses, and lost opportunities.

132. As a result of the fraud perpetrated by Choslovsky and O'Connor through the forgery of the Guaranty, Subsero Capital and its member suffered reputational damages.

WHEREFORE, Subsero Capital requesst that judgment be entered in their favor and against Choslovsky and O'Connor as follows:

(i) Reasonable attorneys' fees and costs, business expenses, and lost opportunities in excess of $100,000 in an amount to be determined at trial;

(ii) Reputational damages in excess of $100,000 in an amount to be determined at trial;

(iii) Punitive damages;

(iv) Pre and post judgment interest;

(v) Such other relief this Court deems just.

**Count II – Fraud Against Wilkes And Ginsberg Jacobs**

133. Subsero Capital repeats and realleges paragraphs 1 to 132 as the allegations of this paragraph.

134. On or about October 13, 2022, Subsero advised Matt Stern and Choslovsky that NTI had not fulfilled its obligations under the MIPA and that the Transaction would not proceed.

135. On information and belief, on or about October 13, 2022, Choslovsky understood that Bret Russell, who he understood to be the financing behind Subsero Capital, was not a party to the MIPA or the Transaction. Consequently, he developed a scheme through which Russell, through his interests in Subsero Capital and other entities, could be pressured to pay off Ginsberg Jacobs' clients, NTI, in a manner that would conceal the legal malpractice by Ginsberg Jacobs in its representation of NTI in the Transaction.

136. Choslovsky's scheme to pressure Russell to pay off Ginsberg Jacobs' clients, NTI, an effort to conceal Ginsberg Jacobs' malpractice, was predicated on the use of a lawsuit that included claims against Subsero Capital to enforce the Guaranty.

137. Since the Guaranty had not been signed, Choslovsky caused O'Connor to create the Forged Guaranty for use as a basis to assert a claim against Subsero Capital in the Cook County Lawsuit.

138. Wilkes participated in the drafting of the pleadings but failed to undertake reasonable diligence to confirm that the allegations made, including that the Guaranty was actually signed by Subsero Capital, were true.

139. No later than August 13, 2025, when he attended the deposition of O'Connor through remote means, Wilkes had actual knowledge that the Guaranty on which the claims asserted in pleadings on which he was a signatory, was a forged document manufactured for the Cook County Lawsuit as a basis to bring a claim against Subsero Capital in that lawsuit.

140 No later than August 13, 2025 following the deposition of its employee, O'Connor, Ginsberg Jacobs had actual notice that the guaranty had been forged including that it had not been executed by Subsero Capital.

141. Ginsberg Jacobs caused verified pleadings predicated on the Forged Guaranty to be filed with the Circuit Court of Cook County through which NTI and its lawyers intended to pursue a claim against Subsero Capital despite knowledge that the claim rested on a forged document created by Choslovsky and O'Connor for the purpose of and use in the Cook County Lawsuit.

142. Upon information and belief Ginsberg Jacobs either intentionally or with reckless disregard for the rights of Subsero Capital, intended to defraud Subsero Capital by the use of the Forged Guaranty.

143. As a result of the fraud perpetrated through the Forged Guaranty, Subsero Capital suffered actual damages in the form of reasonable attorneys' fees and costs, business expenses, lost opportunities and reputational harm.

WHEREFORE, Subsero Capital requests that judgment be entered in their favor and against Wilkes and Ginsberg Jacobs as follows:

(i) Reasonable attorneys' fees and costs, business expenses, and lost opportunities in excess of $100,000 in an amount to be determined at trial;

(ii) Reputational damages in excess of $100,000 in an amount to be determined at trial;

(iii) Punitive damages;

(iv) Pre and post judgment interest;

Such other relief this Court deems just.

**Count III – Conspiracy to Commit Fraud Against All Defendants**

144. Subsero Capital repeats and reallege paragraphs 1 to 132 as the allegations of this paragraph.

145. On or about October 13, 2022, Buyers advised Matt Stern and Choslovsky that NTI had not fulfilled its obligations under the MIPA and that the Transaction would not proceed.

146. On information and belief, on or about October 13, 2022, as he evaluated NTI''s options, Choslovsky recognized that O'Connor and Ginsberg Jacobs had failed to negotiate terms favorable to Ginsberg Jacobs' clients, NTI, should the Transaction not Close in recognition that Subsero Galesburg and Subsero Milan were limited purpose entities created solely for the purposes of the acquisition, a fact known to them prior to the execution of the MIPA.

147. On information and belief, at this same point, Choslovsky recognized that O'Connor and Ginsberg Jacobs had failed to negotiate adequate security for Ginsberg Jacobs' clients, NTI, since they had not obtained an executed Guaranty at the time the MIPA was signed.

148. On information and belief, at this point, Choslovsky also recognized that Ginsberg Jacobs' failures in the Transaction, including its failure to follow-up with its clients to ensure that they undertook the steps required of them to facilitate the Closing, constituted legal malpractice.

149. On information and belief, Zmuda recognized that Califf & Harper's failures in the Transaction, including its failure to follow-up with its clients to ensure that they undertook the steps required of them to facilitate the Closing, constituted legal malpractice.

150. Additionally, Choslovsky understood that Bret Russell, who he understood to be the financing behind Subsero Capital, was not a party to the MIPA or the Transaction. Consequently, he developed a scheme through which Russell, through his interest in Subsero Capital and other entities, could be pressured to pay off NTI in a manner that would conceal the legal malpractice by Ginsberg Jacobs in its representation of NTI in the Transaction.

151. Additionally, Zmuda understood that Bret Russell, who he understood to be the financing behind Subsero Capital, was not a party to the MIPA or the Transaction. Consequently, he developed a

scheme through which Russell, through his interest in Subsero Capital and other entities, could be pressured to pay off NTI in a manner that would conceal the legal malpractice by Califf a & Harpers in its representation of NTI and Matt Stern in the Transaction.

152. Choslovsky's scheme to pressure Russell to pay off NTI, an effort to conceal Ginsberg Jacobs' malpractice, was predicated on the use of a lawsuit that included claims against Subsero Capital to enforce the Guaranty.

153. Since the Guaranty had not been signed by Subsero Capital, Choslovsky caused O'Connor to create a forged Guaranty for use in the Cook County Lawsuit as a device through which ti assert claims in that litigation against Subsero Capital.

154. Choslovsky and O'Connor altered the Guaranty to include an unrelated signature page from a separate document to make it appear that Subsero Capital had signed the Guaranty and that it had done so in January 2022.

155. Choslovsky and O'Connor altered the Guaranty for the unlawful purposes of forging a signed Guaranty, fabricating evidence favorable to their clients, and concealing evidence favorable to Subsero Capital.

156. In furtherance of the unlawful purposes, Choslovsky and O'Connor committed the overt unlawful act of forging the Forged Guaranty to defraud Subsero Capital.

157. By August 13, 2025, following O'Connor's deposition, all Defendants had actual notice that the Guaranty had been forged and yet deliberately chose to continue to pursue the claims asserted by NTI in the Cook County Lawsuit against Subsero Capital despite their knowledge that the claim rested on a forged document.

158. Zmuda and Califf & Harper had actual knowledge that the Guaranty claim rested on a forged Guaranty manufactured by Choslovsky and O'Connor for use in the Cook County Lawsuit following the O'Connor deposition on August 13, 2025. They were aware that the claims that were being brought on behalf of NTI against Subsero Capital in the Cook County Lawsuit, in circumstances in which Zmuda and Califf & Harper were representing NTI in in the Cook County Lawsuit, were based on a forged document

and were baseless.

159. Yet, Zmuda and Califf & Harper took no action to withdraw the claim against Subsero Capital or to withdraw from their representation of NTI in the Cook County Lawsuit and thus continued the facilitation of the fraud and abuse of process undertaken through the Cook County Lawsuit.

160. As a result of the conspiracy between Defendants, Subsero Capital suffered actual damages in the form of reasonable attorneys' fees and costs, business expenses, lost opportunities, and reputational damages.

WHEREFORE, Subsero Capital request that judgment be entered in its favor and against Defendants as follows:

(i) Reasonable attorneys' fees and costs, business expenses, and lost opportunities in excess of $100,000 in an amount to be determined at trial;

(ii) Reputational damages in excess of $100,000 in an amount to be determined at trial;

(iii) Punitive damages

(iv) Pre and post judgment interest;

(v) Such other relief this Court deems just.

**<u>Count IV – Abuse of Process (Extortion Through The Forged Guaranty) Against All Defendants</u>**

161. Subsero Capital repeats and realleges paragraphs 1 to 132 as the allegations of this paragraph.

162. On or about October 13, 2022, Buyers advised Matt Stern and Choslovsky that NTI had not fulfilled its obligations under the MIPA and that the Transaction would not proceed.

163. On information and belief, at that point, as he evaluated NTI''s options, Choslovsky recognized that O'Connor and Ginsberg Jacobs had failed to negotiate terms favorable to Ginsberg Jacobs' clients, NTI, should the Transaction not Close in recognition that Subsero Galesburg and Subsero Milan were limited purpose entities created for the purposes of the acquisition, a fact known to them prior to the execution of the MIPA.

164. On information and belief, at this same point, Choslovsky recognized that he, O'Connor, and Ginsberg Jacobs had failed to negotiate adequate security for Ginsberg Jacobs' clients, NTI, since they had not obtained an executed Guaranty at the time the MIPA was signed.

165. On information and belief, at this point, Choslovsky also recognized that Ginsberg Jacobs' failures in the transaction, including its failure to follow-up with its clients to ensure that they undertook the steps required of them to facilitate the Closing, constituted legal malpractice.

166. On information and belief, at this point, Zmuda recognized that Califf & Harper's failures in the Transaction, including its failure to follow-up with its clients to ensure that they undertook the steps required of them to facilitate the Closing, constituted legal malpractice.

167. Additionally, Choslovsky understood that Bret Russell, who he understood to be the financing behind Subsero Capital, was not a party to the MIPA or the Transaction. Consequently, he developed a scheme through which Russell, through his interest in Subsero Capital and other entities, could be pressured to pay off NTI in a manner that would conceal the legal malpractice by Ginsberg Jacobs in its representation of NTI in the Transaction.

168. Additionally, Zmuda understood that Bret Russell, who he understood to be the financing behind Subsero Capital, was not a party to the MIPA or the Transaction. Consequently, he developed a scheme through which Russell, through his interests in Subsero Capital and other entities, could be pressured to pay off NTI in a manner that would conceal the legal malpractice by Califf & Harper in its representation of NTI in the Transaction.

169. Zmuda caused the Rock Island Litigation to be commenced against Subsero Capital in concert with Choslovsky and NTI, aware that substantially the same claims were the subject of the Cook County Lawsuit, although he was aware that there was no factual basis for the claims against Subsero Capital, to pressure Russell, through his interest in Subsero Capital and other entities, to pay off NTI in a manner that would conceal the legal malpractice by Ginsberg Jacobs and Catliff & Harper in their representation of NTI in the Transaction

170. The schemes by Choslovsky and Zmuda to pressure Russell, through Subsero Capital, to pay off NTI, an effort to conceal the legal malpractice by their law firms, was predicated on the use of a lawsuit that included claims against Subsero Capital to enforce the Guaranty.

171. Since the Guaranty had not been signed by Subsero Capital, Choslovsky caused O'Connor to create a forged Guaranty for use in the litigation.

172. Following the O'Connor deposition, Zmuda and Califf & Harper had actual knowledge that the Guaranty claim rested on a forged Guaranty manufactured by Choslovsky and O'Connor for use in the Cook County Lawsuit. They were aware that the claims that were being brought on behalf of NTI against Subsero Capital in the Cook County Lawsuit, in circumstances in which Zmuda and Califf & Harper were representing NTI in in the Cook County Lawsuit, were based on a forged document and were baseless.

173. Yet, Zmuda and Califf & Harper took no action to withdraw the claim against Subsero Capital or to withdraw from their representation of NTI in the Cook County Lawsuit and thus continued the facilitation of the fraud and abuse of process undertaken through the Cook County Lawsuit.

174. In addition to trying to extort Russell through his interest in Subsero Capital, Defendants used the Cook County Lawsuit and the Rock Island Litigation for the improper purpose of obtaining information about business competitors and defrauding Subsero Capital through the use of a forged Guaranty that caused Subsero Capital to incur the expense of this litigation. Defendants actions were an attempt to extort Russell, the person with an ownership interest in Subsero Capital, to divest himself of business interests in Illinois unrelated to the Transaction.

175. Further, Defendants pursued litigation against Duncan and Vazquez without any legal or factual basis to coerce them to give false testimony against Subsero Capital.

176. As a result of the abuse of process, the Subsero Capital suffered actual damages in the form of reasonable attorneys' fees and costs, business expenses, lost opportunities, and reputational harm.

WHEREFORE, Subsero Capital requests that judgment be entered in its favor and against Defendants as follows:

(i) Reasonable attorneys' fees and costs, business expenses, and lost opportunities in excess of $100,000 in an amount to be determined at trial;

(ii) Reputational damages in excess of $100,000 in an amount to be determined at trial;

(iii) Punitive damages;

(iv) Pre and post judgment interest;

(v) Such other relief this Court deems just.

Dated: December 31, 2025

Respectfully submitted,

SUBSERO CAPITAL, LLC

/s/ *David B. Goodman*
One of its attorneys

David B. Goodman – dg@glgchicago.com
Goodman Law Group | Chicago
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
Tel: (312) 626-1888
Firm ID 63632